49 CCPA

**Marshall B. ALPERT, Appellant,**

v.

**Harvey L. SLATIN, Appellee.**

**Patent Appeal No. 6766.**

United States Court of Customs and Patent Appeals.

July 25, 1962.

Bartholomew A. Diggins, Donald R. Dunner, Robert E. LeBlanc, Diggins & LeBlanc, Washington, D. C. (John B. Henrich, Jr., New York City, of counsel), for appellant.

Norman N. Holland, New York City (George C. Bower, Wilmington, Del., and William T. Estabrook, Washington, D. C., of counsel), for appellee.

Before WORLEY, Chief Judge, MARTIN and SMITH, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

SMITH, Judge.

Despite the voluminous record and briefs which we have been here required to consider, the single comparatively simple issue on this appeal is that of priority of invention of a process for producing titanium metal which is defined in the single count as follows:

"2. The process of producing titanium metal in solid form compris-

ing, dissolving a material of the group consisting of titanium dichloride and titanium trichloride as a solute in a solvent molten bath composed of materials of the group consisting of alkali metal chlorides and alkaline-earth chlorides and mixtures thereof, and electrolyzing said bath containing said solute in a cell containing a solid cathode, thereby depositing titanium metal in crystalline aggregates on said cathode."

The Board of Patent Interferences after a thorough consideration of the extensive record, and what appears to have been a careful and judicious consideration of the adversary contentions, awarded priority to the senior party, Slatin.[1] The junior party Alpert[2] has appealed this decision.

■ We agree with the Board of Patent Interferences that the decision on the priority issue is essentially a factual determination as to which the junior party Alpert has the burden of proof. For the reasons hereinafter stated, we agree with the Board that Alpert did not sustain the burden of proof required of a junior party so that on the present record the senior party Slatin is entitled to the award of priority.

The history of the present interference is both lengthy and complex. Insofar as this history has significance here, the count in issue originated as allowed claim 21 in the Slatin application and was substituted in the interference when the examiner granted Alpert's motion to amend by adding it after finding the original count to be

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Judge O'CONNELL, pursuant to provisions of Section 294(d), Title 28, United States Code.

1. Harvey L. Slatin, the senior party, is involved on the basis of his application Serial No. 109,443, filed August 10, 1949, which is assigned to Timax Associates of New York.

2. Marshall B. Alpert, the junior party, is involved on the basis of application

Serial No. 150,752, filed March 20, 1950, as a joint application of Alpert, Frank J. Schultz and William F. Sullivan. This application was amended after declaration of the interference to remove the name of Sullivan. In the appealed decision, the board granted Alpert's motion to remove the name of Schultz. As the application is here presented, it is that of Alpert alone. The application, which will hereinafter be referred to as the Alpert application, is assigned to the National Lead Company.

unpatentable. No question is present here as to the right of either party to make this count.[3]

■ The party Slatin as the senior party is entitled to prevail unless the junior party Alpert establishes his right to priority by a preponderance of the evidence. Levy v. Gould, 87 F.2d 524, 24 CCPA 910; and Archer v. Papa, 265 F.2d 954, 46 CCPA 835.

■ It is axiomatic that if the junior party is to prevail, the right to do so must be established by proofs which show priority of the precise invention defined by the count. In thus testing Alpert's case we are influenced, as was the board, by Alpert's interpretation of the count in his brief before the board. As stated by the board:

"In Alpert's brief it is stated that there are four specific limitations in the count, a matter evident from inspection of the count, but in particular Alpert develops what is meant by 'depositing titanium metal in crystalline aggregates on said cathode' and the chloride limitation.

"As to the latter limitation it is pointed out that originally the interference was instituted on a count suggested by the examiner that was broader in that it was permissive of halide substituent other than chloride. Such count in the motion period was held unpatentable over the prior art and the present count, which was and is claim 21 of the Slatin application, was substituted in that it distinguished from the prior art in being restricted exclusively to chlorides.

"As to the former limitation 'depositing titanium metal in crystalline aggregates on said cathode' Alpert correctly points out that the history of the limitation in Slatin's application shows that it means what it states; it does not mean lower oxides containing a certain amount of titanium and not titanium deposits in granulated or powdery form (pp. 3, 4, 5 Alpert brief). To these comments it should be added that 'depositing—on the cathode' means precisely that and not in the vicinity of the cathode."

Thus to meet the count, the evidence on behalf of Alpert must establish his right to a date of invention prior to August 10, 1949, Slatin's filing date, upon his invention of a process in which titanium metal was deposited in crystalline aggregates on the cathode of an electrolytic cell from an electrolyte which consists of titanium dichloride or titanium trichloride dissolved in a solvent molten bath compound of materials of the group consisting of alkaline metal chlorides and alkaline-earth chlorides and mixtures thereof.

To establish his case Alpert offered the testimony of seven witnesses, including Alpert, and Schultz and Sullivan, who were originally named as co-inventors, and submitted a number of documentary exhibits.

Alpert asserts that this evidence established conception of the invention of the count on or about December 1, 1948, relying largely on the proofs of a suggestion submitted by him to Messrs. Sullivan and Jacobsen on December 15, 1948 and introduced in evidence as Exhibit 4.[4]

3. While the party Alpert has seen fit to challenge the operability of the process disclosed in the Slatin application, we think this issue is not before us for the reasons: (1) Alpert did not raise this issue by an appropriate motion filed during the motion period, (2) the granting of Alpert's motion to place the claim in the interference is predicated upon the allowability of the claim to both parties and this presupposes support of the claim by the disclosure of an op-

erable process, (3) operability of the process disclosed by Slatin must be presumed to have been determined by the examiner before the allowance of claim 21. This ex parte determination is not here in issue and (4) Rule 258 of the Rules of Practice of the Patent Office.

4. Alpert devotes two pages of his brief to the assertion that he is entitled to the date of conception urged, referring to Exhibit 4 and to the testimony of the

That exhibit is described by the board as suggesting "adoption of a program of exploration of the possibility of depositing titanium by some electrolytic procedure from a titanium salt of lower valence than quadrivalent."

After a careful review of this evidence we agree with the board's opinion that:

"* * * The suggestion, Alpert Exh. 4, was based largely on theoretical considerations, thermo-dynamic in nature, with recommendation that deposition from solutions, aqueous or organic, or from fused salts be tried. * * *

"* * * Conception of an inventive process involves proof of mental possession of the steps of an operative process and, if necessary, of means to carry it out to such a degree that nothing remains but routine skill for effectuation thereof. If after the claimed conception date extensive research was found necessary before achieving minimum satisfactory performance obviously the mental embodiment of that date was a mere hope or expectation, a statement of a problem, but not an inventive conception. Alpert Exh. 4 was followed by extensive research characterized by perplexing intricate difficulties arising every step of the way and accordingly Alpert Exh. 4 is held not to constitute evidence of conception of the invention of the count.

"In fact in view of the nature of the ensuing research this is considered to be one of those unusual cases where the work of conception must be considered to proceed simultaneously with the work of reduction to practice. This doctrine enunciated by Robinson (Robinson on Patents, Vol. 1, Sec. 381, p. 538) is but rarely applied (Smith v. Bousquet, 27 CCPA 1136, 519 O.G. 800, 1940

C.D. 474, 111 F.2d 157) to a residuum of cases where results at each step do not follow as anticipated, but are achieved empirically by what amounts to trial and error. In this type of research the inventor's mind cannot formulate a completed invention until he finally performs a successful experiment. In Alpert's case the contents of the contemporaneous reports, not the confident assertions of the testimony, dictate the application of the doctrine and significantly, they, down to the time of the last report in evidence, August 15, 1949, leave the matter of consummation of a successful experiment in a state of uncertainty."

Alpert's evidence shows that National Lead Company adopted the program proposed in the December 1948 suggestion (Exhibit 4) and that Alpert and Schultz worked on the program, making reports on their progress to their supervisor, Sullivan. Those reports were also transmitted to Sullivan's immediate supervisor, Jacobsen, and Jacobsen's immediate supervisor, Alessandroni.

From these reports and the testimony Alpert established that four specific runs in a series directed to the production of titanium metal by electrolysis were made prior to August 10, 1949. These runs are relied on by Alpert as constituting actual reduction to practice of the invention defined in the count prior to Slatin's filing date. The dates of these runs are March 25, 1949; about May 23, 1949; the week of June 13, 1949; and the week preceding July 18, 1949.

The first alleged reduction to practice is the fourth run in the series, made on March 25, 1949 and reported in Alpert Exhibit 11. Concerning the product of that run, Schultz testified:

"* * * When we concluded this run, we permitted the cell to cool down. In other words, we were con-

witnesses relative thereto. However, neither, in that discussion nor elsewhere in the more than 220 page total of his brief and reply brief does he point out

or assert any specific error in the analysis of the board which we quote in this opinion.

cerned about oxidation of metallic titanium particularly at these temperatures, so we closed the cell, as you see, with the transite top, and we had some inert gas going into it. * * * We permitted this entire business to cool down at room temperature, solidify in position. Then we broke it out. *We found that the material, the titanium metal was in the electrolyte immediately around the cathode and still something seemed to be adhering to the cathode.* We sent both fractions down for analysis." [Emphasis added.]

Examination of the two fractions by x-ray diffraction was made by the witness North. His report on the fraction adhering to the cathode was as follows:

"X-ray Pattern—Not a match with known titanium lines. Two lines may be TIO. Some graphite present."

Only the fraction shown in the electrolyte, or more precisely, the cathodlyte, showed indications of the presence of titanium metal.

We think the board was obviously correct in holding that the evidence regarding the run of March 25, 1949 does not prove the production of "titanium metal in crystalline aggregates" on the cathode. While Alpert argues that the fraction described as "in the electrolyte immediately around the cathode" probably had actually been on the cathode and had broken free when the solidified cell was broken as described by Schultz, that contention is at best mere speculation, and is otherwise unsupported. It is inadequate to meet the burden of proof which must be sustained by Alpert as junior party.

The second run advanced by Alpert as a reduction to practice is run 21, made about May 23, 1949 and reported in a progress report in evidence as Alpert's Exhibit 15. That report, designated as from Alpert and Schultz, states that "the great bulk of the metal was found as sponge firmly adhering to the cathode in the form of a conical mass tapering towards the bottom." It also specifies that

the best material analyzed as 97.5% titanium.

The board noted the analysis of the product in Exhibit 15 but stated:

"* * * as to such analysis and analyses for all subsequent reported runs we run into an insurmountable legal obstacle: there is no specific validating testimony by anyone having first hand knowledge of any of them. Alpert asserts Schultz or his technician would have made the analysis * * *, but Schultz didn't specifically testify as to the matter and his technician wasn't called. Sullivan testified there was an analytical laboratory with adequate facilities associated with the research laboratory * * * but, except for the x-ray report on run 4 there were no analyses sheets submitted or such accompanied by responsible identification. In short, with the exception named, the analytical results are all hearsay and consequently can be accorded no weight."

■ Alpert contends that the reports from Alpert and Schultz to their superiors at National Lead Company must be "considered for all they contain" on the basis of the federal shop book rule, 28 U.S.C. § 1732. We take this contention to mean that these reports must be accepted as proving all statements made therein.

We do not agree with that contention. The federal shop book rule of 28 U.S.C. § 1732 applies to admissibility of routine documents and records which experience has shown to be trustworthy but such records must be weighed against all other circumstances. Alpert has cited no authority to show that the rule is properly applicable to reports of scientific research and tests. We know of no authority for such a position and think such application of the rule would be both improper and unrealistic. Cf. Teter v. Kearby, 36 CCPA 706, 169 F.2d 808. Such reports, in our opinion, are no more than the usual inventor's work or progress

reports which the decisions of this court have held cannot be relied on to establish reduction to practice since they are not an independent corroboration of an inventor's testimony. Cf. Crane et al. v. Carlson, 29 CCPA 879, 125 F.2d 709; Senkus v. Johnston, 35 CCPA 1008, 166 F.2d 597; and Jepson v. Egly, 43 CCPA 853, 231 F.2d 947.

Thus, even accepting the weekly progress reports as a proper exception to the hearsay rule, their weight as corroborative evidence is no more than can be accorded to any other self-serving written document.

■ Alpert's position that the board was barred from dismissing the documentary reports of the analyses of the products because of Slatin's failure to object to their admission during the taking of testimony is not in accordance with and is contrary to Rule 285(c) [5] of the Rules of Practice of the Patent Office, 35 U.S. C.A. Appendix, referred to by him. There is nothing in these reports other than self-serving declarations which by themselves prove nothing. The defect in these reports as evidence is their inherent lack of material which will independently corroborate the testimony of Alpert. This objection could not have been obviated or removed had the objections been made at the time they were offered.

We therefore agree with the board that Alpert has failed to prove that run 21 constituted a reduction to practice of the count. As the board correctly points out, there is no testimony by anyone that he made an analysis of the product produced thereby and there thus is no proof that "titanium metal" was produced, irrespective of the quality of such metal which the count is interpreted as requiring.

The other two tests urged by Alpert as establishing reductions to practice are run 32, conducted during the week of June 13, 1949, and run 43, conducted during the week preceding July 18, 1949. Alpert Exhibits 16 and 17 relate to those runs.

As in the case of the run 21, however, there is no satisfactory proof that "titanium metal in crystalline aggregates" was deposited on the cathode or, in fact, that titanium metal in any form was produced in runs 32 and 43. Alpert testified that the analysis of the product referred to in Exhibit 16 was a chemical analysis made by him or his technician, but there is no testimony corroborating Alpert concerning the analysis and the technician who made the analysis did not testify. The evidence on the analysis of the product of run 43 is similarly deficient.

Alpert also offered in evidence a report, Exhibit 18–A, referring to a hardness test of a metal sample. The report is dated one day after Slatin's filing date, Alpert stating that the purpose of its submission was "not to support a further reduction to practice * * * but solely to demonstrate the nature of the testing procedure which was being conducted" at the time. However, the test is not supported by testimony of the person alleged to have made it and the mere fact that hardness tests were made, even if properly proved, would not overcome the deficiencies in Alpert's proof of reduction to practice pointed out above.

■ From the foregoing analysis of Alpert's proofs, it is apparent that Alpert has failed to sustain his burden of proving a reduction to practice of the claimed invention prior to Slatin's filing date of August 10, 1949. Since, as correctly held by the board, this is a case where there is no conception until a reduction to practice is attained, Alpert has also failed to show conception prior to that date. Moreover, Alpert does not urge that he was diligent from some date prior to Slatin's filing date until some subsequent actual reduction to practice or to his own filing date.

5. Rule 285(c)—"*As to taking of deposition.* Objections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time."

Slatin thus stands to prevail on the basis of the constructive reduction to practice as of his filing date. Consideration of whether Slatin's evidence shows conception or actual reduction to practice prior to his filing date is unnecessary.

Alpert has brought several motions. First, he has moved to strike all of Slatin's testimony and exhibits on the basis of a charge that certain early dates in Slatin's preliminary statements were set out at a time when Slatin knew they were incorrect. That motion was denied by the board. Other motions were directed to striking the testimony of one of Slatin's witnesses on the grounds of inadequate notice, striking certain exhibits on the grounds they are irrelevant, striking certain questions on the grounds they were improper redirect examination and striking other testimony on the ground it was elicited by leading questions.

Although our view of the case renders moot the matters raised in the aforementioned motions, we have examined the evidence of Slatin and do not find it to reveal that the board erred in its treatment of Alpert's motions or that any of Slatin's evidence affects our analysis showing why Alpert's evidence is insufficient to support his position.

A matter of assessment of printing costs remains to be decided. Slatin moved that the cost of printing the entire record be charged to appellant Alpert although a portion of the material therein, comprising principally depositions of certain of Slatin's witnesses, was included only at Slatin's instigation. We have found much of the added material to be necessary in considering fully all of the issues raised on this appeal, several of which have required specific consideration of materials added on the motion of appellee. We thus consider its printing to be properly chargeable to the appellant. Slatin's motion is therefore granted and the cost of printing the entire record is charged to appellant.

For the reasons given, we find that the board correctly awarded priority to the senior party Slatin and we affirm its decision.

Affirmed.

RICH, Judge, did not sit or participate in the decision.